JUSTICE LEAPHART
delivered the Opinion of the Court.
Kippy Joe Hill was charged with deliberate homicide for the death of Laurel Elaine Camper which occurred on June 29,1996. In Justice Court, Hill filed a motion for an order prohibiting dissemination of evidentiary material to the news media. On the same day that the motion was filed, the Justice Court entered an order barring the Ravalli County Sheriff’s office, the Ravalli County Attorney’s office and anyone else involved in the investigation, prosecution or defense of the matter, from providing any factual or evidentiary information concerning the case to the public or the press.
After entry of the above order by the Justice Court, the State filed an Information against Hill in the Twenty-First Judicial District Court. Hill then requested that the District Court adopt the Justice *290 Court order prohibiting dissemination of any evidentiary information to the press or public. The State opposed the motion and moved to quash the Justice Court order. A brief hearing was conducted on August 14, 1996, wherein the court proposed issuing a restrictive order tailored more narrowly than the Justice Court order. The State agreed with the court’s proposal. The District Court then entered an order requiring that certain restrictions on pretrial and trial publicity be followed in conformity with Rule 3.6 of the Rules of Professional Conduct. The court’s order (hereinafter referred to as “participant gag order”) applied the Rule, not just to attorneys, but to the defendant, defense witnesses, prosecution witnesses, court staff and all law enforcement officers. Three days later, the District Court followed up its order with a Memorandum reiterating its restrictions and also directing that no evidentiary material was to be filed with the court unless it were under seal.
The Missoulian, a local newspaper, filed an Application for Writ of Supervisory Control asking this Court to assume original jurisdiction of this matter to correct the District Court’s mistakes of law in issuing the restrictive order and in requiring that any filings referencing evidence in the case be submitted under seal. In an order dated October 17,1996, we ordered briefing in the matter and on November 21,1996 entertained oral argument. We reverse the restrictive order and remand for further proceedings.

Factual Background

Neither the Justice Court nor the District Court took any evidence or made any factual findings with regard to their respective restrictive orders. Thus, the record before this Court consists solely of the pleadings and the District Court’s “Restrictive Order” of August 16, 1996 and subsequent “Memorandum and Order” dated August 19, 1996.

Appropriateness of Writ of Supervisory Control

Article VII, Section 2 of the Montana Constitution gives this Court “original jurisdiction, to issue, hear, and determine writs ....” Supervisory control is appropriate where the district comb is proceeding under a mistake of law, and in so doing is causing a gross injustice. State ex rel. Forsyth v. District Court (1985), 216 Mont. 480, 484, 701 P.2d 1346, 1348 (overruled on other grounds); State ex rel. Fitzgerald v. District Court (1985), 217 Mont. 106, 114, 703 P.2d 148, 153-54.
*291 Recently, in State ex rel. Mazurek v. District Court (1996), [277 Mont. 349], 922 P.2d 474, 476-77, we stated:
“Supervisory control is an extraordinary remedy, to be exercised only in extraordinary circumstances. We have said... that to justify such a writ an exigency or emergency must be shown to exist, or that a gross injustice would result from a denial of the writ, and the absence of other adequate relief.... [Supervisory control] has its own appropriate functions, and, without undertaking to define particularly what these functions are, we think one of them is to enable this court to control the course of litigation in the [district] courts where those courts are proceeding within their jurisdiction, but by mistake of law, or willful disregard of it, are doing a gross injustice, and there is no appeal or the remedy by appeal is inadequate. ...” State ex rel. Forsyth v. District Court (1985), 216 Mont. 480, 484, 701 P.2d 1346, 1348 (quoting State ex rel. O’Sullivan v. District Court (1946), 119 Mont. 429, 431-32, 175 P.2d 763, 764); accord State ex rel. Mapes v. District Court (1991), 250 Mont. 524, 528-29, 822 P.2d 91, 94.
It is significant to note that we have issued writs of supervisory control in other cases involving media challenges to court-imposed restrictions on access to information about the criminal trial process. Great Falls Tribune v. District Court (1980), 186 Mont. 433, 608 P.2d 116 and State ex rel. Smith v. District Court (1982), 201 Mont. 376, 654 P.2d 982. We determine that the Missoulian’s petition presents legal issues which are appropriate for us to resolve through a writ of supervisory control.

Questions Presented

Although the Missoulian submits the same arguments for the reversal of the court’s participant gag order and of the court’s sealing of evidentiary documents, the requirement that filings be under seal presents an issue separate and distinct from the issue presented by the participant gag order. We determine that the District Court order presents the following two distinct questions for our consideration:
I. Did the court’s order violate Article II, Section 9 of the Montana Constitution and § 46-11-701, MCA, when it directed that no evidentiary material could be filed with the court unless it were under seal?
II. Did the court’s order violate the First Amendment to the United States Constitution, Article II, Section 9 of the Montana Constitution and § 46-11-701, MCA, when it directed that the defense *292 counsel and staff, defendant, county attorney and staff, court staff, and all law enforcement officers be bound by the Rules of Professional Responsibility regarding restrictions on pretrial publicity and trial publicity?

Discussion

I. Did the court’s order violate Article II, Section 9 of the Montana Constitution and § 46-11-701, MCA, when it directed that no evidentiary material could be filed with the court unless it were under seal?
In its Memorandum and Order of August 19, 1996, the District Court ordered that:
no further evidentiary material be filed with the Court unless it is under seal. Motions or briefs shall not refer to evidentiary matters not already of public record as of this date in the Court file except in general terms.
The Missoulian alleges that the District Court erred in not complying with the requirements of § 46-11-701(3), MCA, before ordering that all future documents referring to evidentiary matters be filed under seal. Section 46-11-701(3), MCA, provides:
The judge may close a preliminary hearing, bail hearing, or any other pretrial proceeding, including a hearing on a motion to suppress, and may seal the record only if:
(a) the dissemination of information from the pretrial proceeding and its record would create a clear and present danger to the fairness of the trial; and
(b) the prejudicial effect of the information on trial fairness cannot be avoided by any reasonable alternative means.
Although not articulated in its brief, the Missoulian presumes that the “any other pretrial proceeding” language in subsection (3) includes the filing of court documents. Although “any other pretrial proceeding” could be construed as limited to proceedings in court it could also be construed to include filings of documents pertinent to the pretrial process as a whole. We hold that “pretrial proceeding” as used throughout § 46-11-701, MCA, is ambiguous, and we must therefore look beyond the plain words of the statute to determine its meaning. When legislative intent cannot be determined from the plain words of a statute the court must examine the legislative history of the statute. Christenot v. State, Dept. Of Commerce (1995), 272 Mont. 396, 401, 901 P.2d 545, 548 (citing Lewis & Clark County v. State, Dept. Of Commerce (1986), 224 Mont. 223, 226, 728 P.2d 1348, 1350).
*293 Section 46-11-701, MCA, was enacted in 1991 in response to our decision in State ex rel. Smith v. District Court (1982), 201 Mont. 376, 654 P.2d 982, in which we addressed a request to exclude the press from a pretrial suppression hearing. Defendant Smith asked this Court to close the evidentiary hearing to the public and the press on the grounds that his fair trial rights would be substantially affected by dissemination of evidence that might be suppressed. Smith, 654 P.2d at 984. We held that, under the Right to Know provision of Article II, Section 9 of the Montana Constitution and the right of access recognized under the First and Fourteenth Amendments to the United States Constitution, the public and press can be excluded from a pretrial suppression hearing “only if dissemination of information acquired at the hearing would create a clear and present danger to the fairness of defendant’s trial and no reasonable alternative means can be utilized to avoid the prejudicial effect of such information.” Smith, 654 P.2d at 987. In arriving at that conclusion, we adopted, in toto, Standard 8-3.2 of the American Bar Association Standards for Criminal Justice (2nd ed. 1978) as the appropriate test to reconcile the competing interests of public access and trial fairness. That Standard was later codified as § 46-11-701, MCA.
The text containing the history of ABA Standard 8-3.2 states explicitly that “the standard governs both the closing of pretrial proceedings and the sealing of court records.” (Emphasis added.) Given that the legislature adopted the standard in toto it follows that the legislature intended § 46-11-701, MCA, to comport with the directives of the Standard. Furthermore, the policy reason behind closing the pretrial suppression hearing in Smith, that of preventing possibly inadmissable evidence from prejudicing potential jurors, is equally applicable to the sealing of evidentiary materials submitted in various court documents normally accessible to the public. We hold, therefore, that “pretrial proceedings,” as used in § 46-11-701, MCA, includes all documents filed in conjunction with the pretrial process, regardless of whether they constitute “records” of a specific court hearing.
In the present case, the record, although sparse, makes it abundantly evident that the District Court did not comply with the explicit requirements of § 46-11-701(3), MCA. That is, the court did not conduct an evidentiary hearing and determine that dissemination of information contained in court filings would present a clear and present danger to trial fairness. Neither did the court consider *294 reasonable alternatives to imposing a blanket order sealing all documents containing reference to evidentiary matters.
In fairness to the trial court, it should be noted that the order was entered with the consent of counsel for the State and for the defendant. Thus, given the consent of the parties, there would appear to be no basis for faulting the court for failure to hold an evidentiary hearing and make appropriate findings. However, consent of the parties cannot serve to override the clear intent of § 46-11-701, MCA, to balance the public’s right to know with the defendant’s right to a fair trial. This balancing can only be accomplished by including the media in the process even though the media is not a “party” to the proceeding in the usual sense of that term. Section 46-11-701(1), MCA, specifically requires that the trial judge “shall seek the voluntary cooperation of the news media in delaying dissemination of potentially prejudicial information until the impaneling of the jury or until an earlier time consistent with the administration of justice.” In the context of a decision to seal court records, that means that the judge must allow the media to be heard as to whether there are any “reasonable alternative means” available to sealing the records. Section 46-ll-701(3)(b), MCA. The parties cannot, by agreement, obviate this requirement. Given that the District Court did not have the benefit of any precedent from this Court interpreting § 46-11-701, MCA, we understand why the court proceeded to act on the basis of consent of the parties. We determine, however, that such a procedure fails to comply with the requirements of § 46-11-701, MCA, which not only requires specific findings by the court but also requires that the media be allowed to participate in the decision making process.
Additionally, the Montana Constitution provides the public, including the media, with a “right to know” under Article II, Section 9 of the Montana Constitution. Smith, 654 P.2d at 985; Great Falls Tribune, 608 P.2d at 119. The Right to Know provision provides:
No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.
The court order in question requires that no evidentiary materials can be “filed with the court” except under seal. When a paper is “filed with the court,” it is filed with the clerk of court. The clerk of court is a “public body” of the county, which, in turn, is a subdivision of state government. As such, filings with the clerk of court fall within the *295 Right to Know provision of Article II, Section 9 of the Montana Constitution. Associated Press v. State of Montana (1991), 250 Mont. 299, 820 P.2d 421 (overruled in part on other grounds). In Associated Press we held that a statutory requirement that all affidavits filed in support of a motion for leave to file a criminal charge or warrant be filed under seal was an unconstitutional infringement of the public’s right to know under Article II, Section 9 of the Montana Constitution. Associated Press, 820 P.2d at 423. Evidentiary materials “filed with the court” likewise fall within the Right to Know provision.
Because the public has a constitutionally protected right to examine public documents, and a defendant has a constitutionally protected right to a fair trial under Article II, Section 24 of the Montana Constitution, a district court’s decision to seal court records must satisfy the standard set out in § 46-11-701(3), MCA, which balances these competing interests. Accordingly, we reverse the court’s order requiring the filing of documents under seal and remand for further proceedings consistent with our holding above.
II. Did the court’s order violate the First Amendment to the United States Constitution, Article II, Section 9 of the Montana Constitution and § 46-11-701, MCA, when it directed that the defense counsel and staff, defendant, county attorney and staff, court staff, and all law enforcement officers be bound by the Rules of Professional Responsibility regarding restrictions on pretrial publicity and trial publicity?
For purposes of this discussion, we refer to the media’s “right to know” but we note that this right is derivative from, and no greater than, the public’s right to know under Article II, Section 9 of the Montana Constitution.
We begin our analysis of this issue by examining our two prior decisions in which we addressed the interplay between the defendant’s right to a fair trial and the public’s right to know guaranteed by Article II, Section 9 of the Montana Constitution.
In 1980 we decided Great Falls Tribune v. District Court (1980), 186 Mont. 433, 608 P.2d 116, in which a district court ordered that individual voir dire examination of prospective jurors in a criminal case be closed to the press and the public. The Tribune sought a writ of supervisory control directing the court to allow the newspaper reporter to attend and observe or to hold a hearing and issue findings of fact and conclusions of law showing that the defendant’s right to a fair trial would be jeopardized by allowing the media access. We issued an order directing the district court to hold a hearing and *296 submit findings and conclusions to this Court concerning its reasons for closing the voir dire exam. Great Falls Tribune, 608 P.2d at 118. The district court conducted a hearing and, in its findings and conclusions, rejected various alternatives (sequestration of prospective jurors, change of venue and continuance of trial date) to closure of voir dire. The court based the closure on its finding of substantial prejudicial pretrial publicity, misstatements of fact, disclosure of defendant’s prior criminal record and disclosure of evidence not generally known to the public. Great Falls Tribune, 608 P.2d at 118.
In rejecting the district court’s rationale for closure, we noted that, although the United States Supreme Court had held that the press has no federal constitutional right to access to a suppression hearing, Gannett Co., Inc. v. DePasquale (1979), 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608, the analysis is considerably different under the Right to Know provision of Article II, Section 9 of the Montana Constitution, which guarantees that any person has the constitutional right to observe court proceedings unless the demands of individual privacy clearly exceed the merits of public disclosure. We held that:
Closure of judicial proceedings breeds suspicion and mistrust in the minds of the public and representatives of the media. Such closure is simply censorship at the source — a denial of the right to know.
Great Falls Tribune, 608 P.2d at 119. We also held that the public’s right to know under Article II, Section 9 of the Montana Constitution had to be balanced against the defendant’s right to a speedy trial by an impartial jury under Article II, Section 24 of the Montana Constitution. Great Falls Tribune, 608 P.2d at 119. In applying that balancing test to the case under consideration, we were unable to see how closing the voir dire examination to the public was necessary to guarantee the right to a fair trial. In reaching that conclusion, we noted a further distinction between the case presented and the Gannett case. In contrast to Gannett, which involved a pretrial suppression hearing, the Great Falls Tribune case involved closure of voir dire which is an integral part of the trial itself.
Closing any part of the trial is simply the first step down that primrose path that leads to destruction of those societal values that open, public trials promote. Nothing short of strict and irreparable necessity to ensure defendant’s right to a fair trial should suffice.
Great Falls Tribune, 608 P.2d at 121 (emphasis added). We vacated the order and ordered that the public and the press be allowed to attend the voir dire examination.
*297 Two years later in Smith, we adopted Standard 8-3.2 of the ABA, governing closure of trial proceedings. Smith, 654 P.2d at 987. In Smith, the defendant in a criminal prosecution applied for a writ of supervisory control seeking to exclude the public and media from a pretrial suppression hearing. We first analyzed the effect of United States Supreme Court decisions, rendered since our previous decision in Great Falls Tribune, regarding the interface between a defendant’s constitutional right to a fair trial and the right of the public and press to observe criminal proceedings. Smith, 654 P.2d at 985. In Richmond Newspapers, Inc. v. Virginia (1980), 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973, the United States Supreme Court recognized the public and press’ right of access to criminal trials under the First Amendment and applied to the states through the Fourteenth Amendment. We noted that, although the Court had construed the First and Fourteenth Amendments as providing a right of access to criminal trials, a right of access to pre trial criminal proceedings had not been recognized in the federal courts.
In contrast, the broad language contained in the Great Falls Tribune case, “that any person has the constitutional right to observe court proceedings,” [citation omitted] most certainly encompasses pretrial proceedings as well as the actual trial.
Smith, 654 P.2d at 986.
We jettisoned the “strict and irreparable necessity” standard from Great Falls Tribune and adopted the ABA Standard as the appropriate test to reconcile the competing interests of public access and trial fairness. Thus, based upon the Right to Know provision of Article II, Section 9 of the Montana Constitution and the right of access recognized under the First and Fourteenth Amendments to the United States Constitution, we held
that the public and press may be excluded from a pretrial suppression hearing only if dissemination of information acquired at the hearing would create a clear and present danger to the fairness of defendant’s trial and no reasonable alternative means can be utilized to avoid the prejudicial effect of such information.
Smith, 654 P.2d at 987.
We also specifically encouraged trial judges to seek the voluntary cooperation of the news media before invoking closure. Finally, in the context of Smith’s motion to suppress evidence due to an allegedly illegal search, we required the district court and the parties to consider the efficacy of entering a prehearing protective order forbidding mention during the hearing of specific items of evidence sought *298 to be suppressed. In remanding for a hearing under the standard set forth, we concluded: “Only if the trial court finds that there is a ’clear and present danger’ and that less restrictive alternatives, including a protective order, cannot protect defendant’s right to a fair trial, should closure be ordered.” Smith, 654 P.2d at 988.
Having summarized our two decisions involving fair trial and public access, it is important to point out that the case subjudice is distinguishable from both Smith and Great Falls Tribune in that it does not involve a trial court order closing a pretrial or trial “proceeding.” Rather, the present case involves an order prohibiting the parties, their attorneys, court staff, and members of law enforcement from disseminating information about the case, other than as permitted under Rule 3.6 of the Montana Rules of Professional Conduct. Such trial participant gag orders are distinguishable from closure of court proceedings. In Section I of this Opinion we held that “pretrial proceedings” as used in § 46-11-701, MCA, encompasses the filing of all documents with the court. The gag order, on the other hand, restricts participants from discussing the case outside of the courtroom. This restriction cannot be said to constitute part of the pretrial proceedings in that the restriction does not pertain to any official documents or statements that constitute part of the court record in the case. Since a participant gag order does not implicate “pretrial proceedings” it is not subject to the scrutiny of § 46-11-701, MCA. Therefore, the District Court did not err by issuing a participant gag order without satisfying the requirements of § 46-11-701, MCA. Nevertheless, we must still address the question of whether the participant gag order violates the media’s First Amendment rights or its right to know under Article II, Section 9 of the Montana Constitution.

The Doctrine of Prior Restraint

The first question we address is whether the court’s order, which indirectly restrains the media’s access to certain sources of information regarding the trial proceedings, constitutes a prior restraint, thereby violating the media’s First Amendment rights. The doctrine of prior restraint on publication finds its roots in the United States Supreme Court decision in Near v. Minnesota ex rel. Olson (1931), 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, in which the Court struck down a statute which allowed Minnesota to enjoin publication of malicious, scandalous and defamatory newspapers. The Court stated: “it has been generally, if not universally, considered that it is the chief purpose of the [freedom of press] guaranty to prevent previous *299 restraints upon publication.” Near, 283 U.S. at 713, 51 St.Ct. at 630. The Court held that the order entered pursuant to the Minnesota statute was an unconstitutional prior restraint of the press.
A court may impose a prior restraint on the media for the purpose of protecting the integrity of criminal proceedings only if “the gravity of the ‘evil,’ discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.” Nebraska Press Ass’n v. Stuart (1976), 427 U.S. 539, 562, 96 S.Ct. 2791, 2804, 49 L.Ed.2d 683, 699. The Court in Nebraska Press Ass’n held that a court order prohibiting publication of a criminal defendant’s confession constituted an unconstitutional prior restraint on publication. In expressing its concerns about prior restraints, the Court stated, “[i]f it can be said that threat of criminal or civil sanctions after publication ‘chills’ speech, prior restraint ‘freezes’ it at least for the time.” Nebraska Press Ass’n, 427 U.S. at 559, 96 S.Ct. at 2803. The Court in Nebraska Press Ass’n relied on “[professional studies ... recommending that trial courts in appropriate cases limit what the contending lawyers, the police, and witnesses may say to anyone[,]” Nebraska Press Ass’n, 427 U.S. at 564, 96 S.Ct. at 2805, thereby intimating that, in lieu of prior restraints on the media, restraints on trial participants may be an appropriate means for minimizing prejudicial communications concerning trial proceedings.
In the wake of Nebraska Press Ass’n, there has been considerable disagreement as to whether participant gag orders are prior restraints on the media. Those cases holding that such orders are prior restraints on the media are typified by the Tenth Circuit decision in Journal Publishing Co. v. Mechem (10th Cir. 1986), 801 F.2d 1233. The Tenth Circuit, in response to a publisher’s challenge, held that a court order which prohibited jurors from post-trial interviews with the media was an unconstitutional restraint upon the publisher’s First Amendment right to gather news. See also CBS, Inc. v. Young (6th Cir. 1975), 522 F.2d 234 (holding that a participant gag order was a prior restraint on CBS’ right to gather news); Connecticut Magazine v. Moraghan (D.Conn. 1987), 676 F.Supp. 38 (holding that a gag order directed at the trial attorneys constituted a prior restraint on the right to gather news and derivatively on publication and was therefore unconstitutional).
Other courts take the view that an order which is not directed at the media does not constitute a prior restraint on publication. The Second Circuit employed this rationale in Application of Dow Jones & Co. (2nd Cir. 1988), 842 F.2d 603, cert. denied, 488 U.S. 946, 109 *300 S.Ct. 377, 102 L.Ed.2d 365. In Dow Jones, the trial court had prohibited parties and attorneys from making extrajudicial statements to the media. Media organizations challenged the order as being a prior restraint of their right to gather news. Dow Jones, 842 F.2d at 608. The Circuit Court held that the determination of whether a gag order constitutes a prior restraint depends upon the status of the challenging party. A gag order constitutes a prior restraint when challenged by the “individual gagged,” but not when challenged by a “third party.” Dow Jones, 842 F.2d at 609. The court acknowledged that the order in question limited the “flow of information readily available to the news agencies. ...” Dow Jones, 842 F.2d at 608. Nonetheless, it held that the order was less intrusive upon the media than an order which directly threatened to sanction the media. While an order directed at the media would be examined under the prior restraint standard, an indirect restraint would be permitted upon a showing of “a ‘reasonable likelihood’ that pretrial publicity [would] prejudice a fair trial.” Dow Jones, 842 F.2d at 610. In Dow Jones, the order in question was buttressed by evidence of a threat to the administration of justice and evidence that the lower court had considered less restrictive alternatives such as change of venue, postponement of trial, extensive voir dire and jury sequestration. Dow Jones, 842 F.2d at 611.
The Second Circuit distinguished prior restraints from participant gag orders by pointing out that participant gag orders lack the “most offensive aspect of a prior restraint [which] is the censorship involved by forbidding the dissemination of information already known to the press and therefore public.” Dow Jones, 842 F.2d at 608. It is this right to engage in the editorial process free from government intervention which is the core of the constitutional guarantee of a free press. Although participant gag orders impede the flow of communication, they do not intrude upon the prerogative of the media to publish that which it knows. Thus, the Second Circuit held that participant gag orders are not subject to the same level of scrutiny as direct restraints against the press and will be upheld if “reasonable.” Dow Jones, 842 F.2d at 609-610.
We agree with the Second Circuit that prior restraint analysis is dependent upon the status of the party bringing the challenge. Additionally, prior restraint analysis is dependent on whether the restraint impacts the media’s prerogative to publish that which it knows as opposed to its ability to acquire new information.
*301 While an order restraining the trial participants from communicating with the press may be a prior restraint upon the participants as communicators, it is not a prior restraint upon the press. Since a gag order imposed on trial participants does not “prohibit the publication or broadcast of particular information or commentary,” it does not constitute a “previous” or “prior” restraint upon publication of speech. Nebraska Press Ass’n, 427 U.S. at 556, 96 S.Ct. at 2801. The distinction between restraining orders directed at trial participants challenged by the press and those challenged by the trial participants themselves is illustrated by two decisions from the Ninth Circuit Court of Appeals involving the same restraining order. Compare Radio and Television News Ass’n v. United States District Court (9th Cir. 1986), 781 F.2d 1443 (holding that a restraining order not directed at the press does not restrain the press’ First Amendment rights) with Levine v. United States District Court (9th Cir. 1985), 764 F.2d 590, 595 (holding that “t)ie district court’s order is properly characterized as a prior restraint” on counsel’s First Amendment right to free speech).
As one commentator has observed, the Radio and Television decision illustrates that the prior restraint doctrine does not accommodate receiver’s rights and is “insensitive to restriction of the communication process as a whole.” Note, A Prior Restraint by Any Other Name: The Judicial Response to Media Challenges of Gag Orders Directed at Trial Participants, 88 Mich. L. Rev. 1171, 1181 (1990). The same commentator correctly notes that the prior restraint doctrine, in that it focuses solely on the communicator rather than the receiver of the communication, does not extend any protection to the communication process as a whole.
Given that the prior restraint doctrine protects only the rights of the communicator, another means of protecting the communication process as a whole, and the rights of receivers of information in particular, must be employed to safeguard the entire bundle of rights guaranteed by the First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution.
The primary purpose of the First Amendment to the United States Constitution is to encourage and protect an “unfettered interchange of ideas for the bringing about of political and social changes. ...” New York Times Company v. Sullivan (1964), 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686, 700. In other words, the First Amendment protects not just speech itself but the entire process of *302 communication, including the exchange of ideas and information between speaker and listener.
Although the United States Constitution, unlike the Montana Constitution, does not specifically guarantee a “right to know,” a right to receive information has been recognized under First Amendment principles. See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc. (1976), 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346, in which the Court invalidated a statute which prohibited pharmacists from advertising prices of prescriptions. In holding that the ban violated consumers’ First Amendment rights to receive information, the Court extended First Amendment protection “to the communication, to its source and to its recipients both.” Virginia Bd. of Pharmacy, 425 U.S. at 756, 96 S.Ct. at 1823. See also Red Lion Broadcasting Co. v. F.C.C. (1969), 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371, in which the Court required broadcasters to provide equal air time to competing political interests, holding that the “right of the viewers and listeners, not the right of broadcasters, ... is paramount.” Red Lion, 395 U.S. at 390, 89 S.Ct. at 1806.
Recognition of the recipient’s rights is particularly compelling in Montana where there exists, in addition to the right to free speech found in the First Amendment to the United States Constitution and in Article II, Section 7 of the Montana Constitution, the “Right to Know” provision of Article II, Section 9 of the Montana Constitution.
The “Right to Know” provision grants the citizens of this state the right of access to all public documents and deliberations of public bodies. The contents of a communication which a trial participant might wish to make outside the courtroom or prior to trial, could be, under most circumstances, considered private communication rather than a governmental proceeding and thus not subject to the public’s right to know. However, Article II, Section 9’s guarantee of a right to know grants the public an interest in receiving information about the criminal process. Great Falls Tribune, 608 P.2d at 119; Smith, 654 P.2d at 986. This interest is broader than mere access to in-court proceedings or official court filings. Rather, the public has a right to receive information about the entire criminal law process. We hold that the right to know extends to receiving any information which pertains to the criminal law process, regardless of whether that information emanates directly from the courthouse or indirectly from those who are participating in the system as law enforcement officers, attorneys, parties or witnesses and who may wish to communicate with the public or the press about the process.
*303 Our holding that the public and press have a right to know about the entire criminal law process is buttressed by the Ohio Supreme Court decision in State ex rel. National Broadcasting Company, Inc. v. Court of Common Pleas (Ohio 1990), 556 N.E.2d 1120. The Ohio Supreme Court held that a participant gag order, similar to the order at bar, violated the public’s right of access to criminal proceedings under both the federal and state constitutions. In a previous case, the Ohio court had established that a newspaper had standing to challenge a trial court order prohibiting the public and reporters from pretrial hearings. The court in NBC, Inc. held that the same reasoning applied “with no less force to the criminal case as a whole,” even though an order not directed at the media was a “lesser restriction” on access. NBC, Inc., 556 N.E.2d at 1124.
The Ohio Supreme Court relied on the United States Supreme Court decision in Press-Enterprise Co. v. Superior Court of California (1986), 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1, which held that the media had a First Amendment right of access to a transcript of a preliminary hearing, where the defendant could not show a “substantial probability” that his right to a fair trial would be prejudiced by releasing the information. Press-Enterprise, 478 U.S. at 14-15, 106 S.Ct. at 2743-44. The Court in Press-Enterprise based its holding on the federal constitutional right of access to proceedings which have “historically been open to the press and general public” and in which “public access plays a significant positive role in the functioning of the particular process in question.” Press-Enterprise, 478 U.S. at 8, 106 S.Ct. at 2740. The Ohio Supreme Court, relying on Globe Newspaper Co. v. Superior Court (1982), 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248, held that “[cjriminal trials have historically been open to the public, and public access has always been considered essential to the fair and orderly administration of our criminal justice system.” NBC, Inc., 556 N.E.2d at 1124. The Ohio Supreme Court further recognized that the “open courts” provision of the Ohio Constitution also embraced a right of access. NBC, Inc., 556 N.E.2d at 1124. Because both federal and state constitutional principles recognized a right of access to criminal proceedings “as a whole,” the court held that the participant gag order as challenged by the media was subject to scrutiny under the test established in Press-Enterprise for determining the constitutionality of restrictions on access to criminal trial proceedings. NBC, Inc., 556 N.E.2d at 1125.
We hold that participant gag orders, including the one at bar, do not constitute prior restraints on publication, and therefore are *304 not subject to traditional prior restraint analysis. And, although § 46-11-701, MCA, contains a standard for reviewing indirect restraints on the media, its provisions govern only access to official court proceedings and documents. Although participant gag orders are also an indirect restraint on the media, the restraint is not as intrusive as in the case of closure of proceedings which cuts off the media’s access to official court proceedings. For this reason, a lesser level of scrutiny should be adopted to determine the constitutionality of a participant gag order. The level of scrutiny must protect both the defendant’s right to a fair trial and the media’s right to know under Article II, Section 9 of the Montana Constitution and the media’s right to free speech under the First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution.
Having recognized that Article II, Section 9 of the Montana Constitution guarantees the media a right to receive information about criminal proceedings, it is implicit that the media should not have information about the trial process restricted except to the extent that restrictions are required to protect the defendant’s right to an impartial jury under Article II, Section 24.
As indicated above, the “clear and present danger” standard employed by the prior restraint on publication doctrine is by definition and historical usage directed at the rights of the communicator rather than the recipient and thus does not adequately protect the media’s right to receive information; that is, its right to “know” as opposed to its right to publish that which it already knows. Accordingly, we decline to employ the common law “clear and present danger” standard in evaluating a participant gag order challenged by the media. We likewise decline to employ the statutory “clear and present danger” standard used in § 46-11-701(3), MCA, because we hold that the media has a lesser interest in communicating with trial participants than in accessing official court documents or court proceedings. By the same token, we find the “reasonableness” standard used by the Second Circuit in the Dow Jones decision too lenient a standard to adequately protect the right to know under Article II, Section 9.
As we recognized in Great Falls Tribune, the public’s right to know under Article II, Section 9 must be balanced against the defendant’s right to an impartial jury under Article II, Section 24. In the context of a participant gag order, this balancing should be accomplished pursuant to a heightened scrutiny standard. Similar to the heightened scrutiny standard applied by courts for constitutional *305 equal protection analysis, a heightened scrutiny standard applied to participant gag orders eliminates the stark choice between judging gag orders on either a reasonableness test or a “clear and present danger” test. The “clear and present danger test,” in effect, treats first amendment rights as paramount; thus making it difficult to truly “balance” such rights against the right to a fair trial. As Justice White expressed in his concurring opinion in Nebraska Press Ass’n, “there is grave doubt” that a prior restraint on the press would ever be justified under the “clear and present danger” test. Nebraska Press Ass’n, 427 U.S. at 570-71, 96 S.Ct. at 2808-09 (White, J., concurring). A heightened scrutiny standard employs a middle-ground approach which accommodates the competing interests of free speech and fair trial rights.
Consistent with the Ohio Supreme Court’s use of a heightened scrutiny test for the issuance of gag orders, we hold that where the rights of the accused to a fair trial are asserted, a gag order may issue only when the following conditions have been met: (1) the press and general public must be given an opportunity to be heard on the question before issuance of the order; (2) the court describes what reasonable alternatives have been considered and explains why those reasonable alternatives cannot adequately protect the defendant’s fair trial rights; (3) the order is narrowly tailored to serve the interest of protecting the defendant’s fair trial rights; and (4) the court has made specific findings that there is a substantial probability that the defendant’s right to a fair trial will be prejudiced by publicity that the gag order would otherwise prevent. This test grants more protection to the defendant than allowed under traditional prior restraint analysis and at the same time guarantees greater protection of the public’s right to know under Article II, Section 9 of the Montana Constitution than offered by a reasonableness test. First, the participant speech in question must pose a substantial probability of harm to the trial process as compared with posing a clear and present danger to the trial process as is required to uphold a prior restraint or to close proceedings under § 46-11-701, MCA. Secondly, unlike the reasonableness test, the heightened scrutiny test requires an order to be narrowly drawn. Broad sweeping gag orders which restrict “all counsel and Court personnel, all parties concerned with this litigation, whether plaintiffs or defendants, their relatives, close friends, and associates” from discussing the case “in any manner whatsoever” with the media will not pass muster. CBS, Inc., 522 F.2d at 236.
*306 Employing a heightened scrutiny standard to participant gag orders challenged by the media protects the media’s First Amendment rights as receivers of information and protects its “right to know” guaranteed under Article II, Section 9 of the Montana Constitution.

Summary

In summary, prior restraints on publication consist of court imposed restrictions (1) which are directed at the media, and (2) which intrude upon the media’s editorial process by interfering with its right to publish material which it already possesses. Prior restraints are subject to the “clear and present danger” test established in New York Times.
Indirect restraints of the media include (without limitation):
(1) Restraints which are aimed at the media’s ability to gather information or to access official proceedings but which do not intrude upon the media’s prerogative to publish or edit information already in its possession. Examples include orders which prohibit the press from attending voir dire examinations or pretrial suppression hearings. Such restrictions are not “prior restraints” on publication but are, nonetheless, subject to the “clear and present danger” standard under Smith, 654 P.2d 982 and § 46-11-701, MCA.
(2) Restraints which are not directed at the media but at the sources of information; for example, participant gag orders. Although such restrictions infringe upon the media’s ability to access news and thus the public’s right to know, they are not “prior restraints” upon the media’s right to edit or publish that which it knows.
On a continuum, the participant gag order is not as intrusive as a “prior restraint” upon publication nor as intrusive as an order restricting news sources through closure of court proceedings or sealing of court documents, both of which trigger a “clear and present danger” test. The participant gag order does, nonetheless, impinge upon the media’s right to access news and thereby further the public’s right to know. Such orders are, thus, subject to a heightened scrutiny analysis.

Conclusion

We HEREBY reverse the District Court’s Restrictive Order and subsequent Memorandum and Order and remand for further proceedings consistent with this Opinion including application of the standard set forth in § 46-11-701, MCA, to any decision to seal court documents and application of the heightened scrutiny standard to the *307 issuance of any participant gag order. Without necessarily approving of the use of a Rule of Professional Conduct to regulate trial participant speech, we note for the District Court’s consideration that Rule 3.6 of the Montana Rules of Professional Conduct no longer comports with the ABA Model Rule 3.6. The ABA Model Rule 3.6 was modified in 1994 in response to the United States Supreme Court’s criticism of the Rule in Gentile v. State Bar of Nevada (1991), 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888. The Court found that in applying a Nevada Supreme Court rule nearly identical to ABA Model Rule 3.6, “[t]he lawyer has no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated.” Gentile, 501 U.S. at 1048-49, 111 S.Ct. at 2731. The new version of the ABA Model Rule 3.6 clarified the list of presumptive statements that an attorney was allowed to make under the previous Rule and provided the attorney with a right of reply. Model Rules of Professional Conduct Rule 3.6(c) (1994). In the event the District Court issues a restrictive order upon remand, it should evaluate whether the unmodified Rule 3.6 of the Montana Rules of Professional Conduct is an appropriate model upon which to base a restrictive order in light of the ABA modification of the Rule.
CHIEF JUSTICE TURNAGE, JUSTICES TRIEWEILER and GRAY concur.