No. 99-175

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 160

300 Mont. 233

4 P. 3d 5

THE ASSOCIATED PRESS, INC., a New York

not-for-profit corporation registered to do

business in Montana; the MISSOULIAN; the

GREAT FALLS TRIBUNE; the BILLINGS GAZETTE;

KULR-TV; the DAILY INTERLAKE; KTVQ-TV;

the MONTANA NEWSPAPER ASSOCIATION;

and THE MONTANA FREEDOM OF INFORMATION

HOTLINE, INC.,

Petitioners and Appellants,

v.

MONTANA DEPARTMENT OF REVENUE,

Respondent and Respondent.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Karl J. Englund, Attorney at Law, Missoula, Montana

Thomas Beers, Beers Law Offices, Missoula, Montana

For Respondent:

Brenda Gilmer, Montana Department of Revenue, Helena, Montana

Submitted and Argued: November 4, 1999

Decided: June 20, 2000

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 The Associated Press, Inc., the Missoulian, the Great Falls Tribune, the Billings Gazette, KULR-TV, the Daily Interlake, KTVQ-TV, the Montana Newspaper Association, and the Montana Freedom of Information Hotline, Inc. (Appellants) appeal from the judgment entered in favor of the Montana Department of Revenue (Department) by the First Judicial District Court, Lewis and Clark County. We reverse and remand.

¶2 We restate the issues presented on appeal as follows:

¶3 1. Whether Rule 42.2.701, ARM, violates Article II, Section 9 of the Montana Constitution?

¶4 2. Whether the Department may declare coal severance tax information confidential when it had been disclosed for a number of years prior to the promulgation of Rule 42.2.701, ARM?

¶5 3. Whether Rule 42.2.701, ARM, violates the public records statutes?

BACKGROUND

¶6 In 1975 the Montana Legislature enacted a coal severance tax. *See* § 15-35-103, MCA. To facilitate collection of the coal severance tax, each coal mine operator is required to provide the Department with a quarterly statement containing the tonnage produced, the average Btu value of the production, the contract sales price received for the production, and such other information as the Department may require. *See* § 15-35-104, MCA.

¶7 Following the enactment of the coal severance tax, the information provided to the Department by the coal mine operators was routinely made available to the public in the form of quarterly coal severance tax collection summaries prepared by the Department. The information contained in these summaries included the name of the coal company, the location of each coal mine by county, the total tons produced by each mine, the amount of tonnage exempt from taxation for each mine, the taxable production for each mine, the average contract sales price per ton for each mine, the total coal severance tax paid by each mine, the incentive tax credit (now expired), and the net tax paid by each mine.

¶8 On November 15, 1993, the Department adopted Rule 42.2.701, ARM, which declared information, such as tax returns, that taxpayers are required to provide to the Department and Department-prepared documents that identify taxpayers to be confidential. Pursuant to the adoption of the rule, the Department changed the quarterly coal severance tax collection summaries to include only the name of the coal company, the location of each coal mine by county, the total tons produced by each mine, the average sales price per ton for all Montana coal mines combined, and the total tax paid by all Montana coal mines combined.

¶9 On January 3, 1994, a Helena law firm representing the Montana Freedom of Information Hotline requested copies of the 1992 and 1993 quarterly coal severance collection summaries from the Department on behalf of the Associated Press pursuant to Article II, Section 9 of the Montana Constitution. Relying on recently adopted Rule 42.2.701, ARM, the Department denied the request on February 10, 1994, claiming that it had a responsibility to protect the privacy rights of all Montana taxpayers. However, in light of the public's interest in this information, the Department indicated that it would be releasing a summary of statistical information including the total tons of coal mined by each company and the average price of coal and the total amount of severance tax paid for

all Montana coal mines.

¶10 On July 14, 1994, Appellants filed an Application for Writ of Mandate and Petition for Declaratory Judgment, requesting the following relief:

> 1. A writ of mandate compelling the Department to provide Appellants with information and documents contained in the Department's files that were provided to the Department pursuant to § 15-35-104, MCA.

> 2. An order declaring the provisions of Rule 42.2.701, ARM, to be invalid because it conflicts with § 2-6-102, MCA.

> 3. An order declaring the provisions of Rule 42.2.701, ARM, to be unconstitutional.

> 4. An award of reasonable attorney fees and costs to Appellants pursuant to § 2-3-221, MCA.

> 5. Any other relief the District Court deems just and proper.

The Department responded to the Appellants' application by alleging, *inter alia*, that it failed to state a claim upon which relief could be granted and should be dismissed.

¶11 Subsequently, both parties moved for summary judgment regarding the validity of Rule 42.2.701, ARM. Appellants alleged that Rule 42.2.701, ARM, violates the public's constitutionally guaranteed "right to know" in two respects. First, 42.2.701, ARM, conflicts with Montana's public records statutes, which allow citizens the right to examine and copy all records held by the government. Second, Rule 42.2.701, ARM, directly conflicts with Article II, Section 9 of the Montana Constitution, which guarantees the public the right to inspect documents held by state agencies unless the demands of individual privacy clearly exceed the merits of public disclosure.

¶12 Regarding the constitutionality of Rule 42.2.701, ARM, the Department contended that it was validly enacted as an interpretive rule pursuant to its general rulemaking authority under § 15-1-201, MCA, with respect to supervision of the administration of all revenue laws of the state, and as such, it is constitutional. The Department also asserted that its purpose for adopting the rule was to inform the public of the Department's procedures regarding the confidentiality of certain tax information.

¶13 The Department also asserted that Appellants were asking the District Court to ignore the taxpayers' right to privacy guaranteed by Article II, Section 10 of the Montana Constitution. The Department went on to state that prior to authorizing release of the requested information, the District Court must first determine whether a privacy interest exists and if it does, then balance that interest against the public's right to know. Further, the Department alleged that whether or not the taxpayers have a subjective expectation of privacy in the requested information is a factual question, necessitating the denial of summary judgment.

¶14 After the motions for summary judgment had been fully briefed and orally argued by the parties, the District Court entered its Decision and Order denying summary judgment in all respects. The basis for the District Court's denial was that the issue of whether the taxpayers have a subjective expectation of privacy involves questions of fact, requiring an evidentiary hearing to determine the issue.

¶15 More than a year after the District Court had entered its Decision and Order, Appellants filed a Motion for Reconsideration. The basis for this motion was the Appellants' belief that the District Court's Decision and Order failed to address several dispositive arguments. Appellants stated that this case concerns the issue of whether Rule 42.2.701, ARM, is an invalid infringement on the public's statutory and constitutional right to examine government records. Appellants went on to state that they were not challenging whether they were entitled to receive the information at issue; they were simply challenging the rule itself on constitutional and statutory grounds. Appellants argued, *inter alia*, that Rule 42.2.701, ARM, is facially unconstitutional because it fails to provide for a case-by-case determination concerning whether the demands of individual privacy clearly exceed the merits of public disclosure.

¶16 The Department opposed the Motion for Reconsideration on the grounds that Appellants' motion was not allowed under the Montana Rules of Civil Procedure; if allowed by Rules 59 or 60, M.R.Civ.P., it was time-barred; and Appellants had failed to provide the District Court with any new reasoning or legal precedent upon which the District Court should alter its decision. The Department also asserted that the District Court had previously determined Rule 42.2.701, ARM, to be valid as a matter of law. The Department further argued that the requisite balancing test was the foundation for the rule.

¶17 After the Motion for Reconsideration had been fully briefed by the parties, the District Court entered an Order denying the motion based upon its conclusion that the motion was

untimely and without merit. At a subsequent scheduling conference, the District Court set the evidentiary hearing concerning the issue of the taxpayers' subjective right of privacy for August 27, 1998.

¶18 Prior to the evidentiary hearing, the parties submitted proposed findings of fact and conclusions of law. In addition, the District Court entered a Pre-Trial Order, which was approved by the parties. Several witnesses testified at the hearing, including the former director of the Department during the time Rule 42.2.701, ARM, was promulgated; the former bureau chief for the Natural Resource Corporation Taxation Division of the Department; a certified public accountant; representatives from several Montana coal companies; and the Montana bureau chief for the Associated Press. At the conclusion of the hearing, the District Court offered the parties the opportunity to submit supplemental proposed findings of fact and conclusions of law within 30 days, which the parties did.

¶19 On December 29, 1998, the District Court entered its Findings of Fact, Conclusions of Law and Order awarding judgment to the Department. The District Court found that the Department adopted Rule 42.2.701, ARM, after balancing the public's right to know with the coal producers' right to privacy. In addition, the District Court concluded that the coal severance taxpayers had, and continue to have, a reasonable expectation of privacy with respect to the information they provide to the Department, which exceeds the public's right to know. Appellants appeal from the District Court's Findings of Fact, Conclusions of Law and Order awarding judgment in favor of the Department.

## STANDARD OF REVIEW

¶20 "We review a district court's conclusions of law to determine whether they are correct." *Brady v. Montana Dept. of Justice*, 1999 MT 153, ¶ 6, 295 Mont. 75, ¶ 6, 983 P.2d 292, ¶ 6.

## ISSUE 1

¶21 Whether Rule 42.2.701, ARM, violates Article II, Section 9 of the Montana Constitution?

¶22 Appellants contend that Rule 42.2.701, ARM, directly conflicts with Article II, Section 9 of the Montana Constitution in that it fails to balance the competing interests of privacy and public disclosure on a case-by-case basis. Appellants also contend that the

rule contains a facially unconstitutional presumption in favor of confidentiality. At oral argument, the Department alleged that its adoption of Rule 42.2.701, ARM, was premised on the balancing of the taxpayers' right to privacy and the public's right to know.

23 ¶Rule 42.2.701, ARM, reads as follows:

## PUBLIC ACCESS TO TAXPAYER INFORMATION

(1) The Montana Constitution guarantees individuals and corporations the right to privacy in Article II, Section 10. Under this provision of the Constitution, and in conjunction with various statutes in the Montana Code Annotated, the department will protect the privacy interests of taxpayers with regard to information they submit to the department.

> (a) A protected privacy interest exists when a person expects the information they submit to remain private and that expectation of privacy is reasonable by societal standards.

> (b) It is generally accepted that most taxpayers have a reasonable expectation that income and financial data and other information provided to the department will remain private, unless courts or the legislature have specifically recognized that the information is subject to public disclosure.

(2) The Montana Constitution guarantees the public's right to know. The right-to-know provision of the Montana Constitution is intended to keep the public informed about the workings of state government. The public's right to know must be balanced against the individual right of privacy.

(3) Information, such as tax returns, that taxpayers are required to provide to the department, and department-prepared documents, such as audit reports, that identify taxpayers are confidential, unless it is clear that a taxpayer does not have a protected privacy interest in information found in the documents.

(4) Documents prepared by the department that do not identify taxpayers and their associated private information are not confidential and will be released.

(5)(a) The department considers the following to be confidential information based on the Montana Constitution:

(i) tax returns, certain reports and audits for natural resource taxes such as net and gross proceeds and severance taxes;

(ii) tax returns, certain reports and audits for miscellaneous taxes such as cigarettes, lodging facilities, and dangerous drugs; and

(iii) tax returns, certain reports and audits of alcoholic beverage taxes.

(b) The department considers the following to not be confidential information based on the Montana Constitution:

(i) information describing the physical characteristics of property or other information which is used to determine values for property tax assessments. Examples include personal property reports, real property record cards, and allocation reports;

(ii) information the department obtains from public sources rather than the taxpayer; and

(iii) statistical compilations of confidential information which do not identify sensitive information about taxpayers. Examples of these include oil and gas quantity reports provided to the board of oil and gas conservation, coal production reports which do not identify taxpayers, and masked individual income tax information which does not identify taxpayers.

(c) The list of taxes is not intended to be all inclusive but simply provide examples of information which is not covered by a specific statute. Statutes which require confidentiality are presumed constitutional.

(6) Confidential information must be provided to the taxpayer themselves, or to their designee. Requests for this information must be submitted by the taxpayer in writing to the department. These requests will be maintained in the files of the department.

(History: Sec. 15-1-201, MCA; IMP, Montana Constitution, Art. II, Sections 8, 9, & 10; Attorney General Opinions 38-59 and 39-17; Secs. 2-4-501; 2-4-623; 2-6-109; 15-7- 308; 15-30-303; 15-31-507; 15-35-205; 15-38-109; 15-50-205; 15-50-206; 15-50-207; 16-3-

211; 16-3-404; 16-11-120; and 16-11-122, MCA; NEW, 1993 MAR p. 2811, Eff. 11/25/93.)

¶24 The public's right to know is contained in Article II, Section 9 of the Montana Constitution, which states:

> **Right to know.** No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

This constitutional provision generally requires information regarding state government to be disclosed to the public, except in cases where the demand of individual privacy clearly exceeds the merits of public disclosure. Hence, the right to know is not absolute. *See Missoulian v. Board of Regents* (1984), 207 Mont. 513, 529, 675 P.2d 962, 971; *see also* Order Selecting the Fifth Member of the Montana Districting and Apportionment Commission (Aug. 3, 1999) (Regnier, J., specially concurring). It requires a balancing of "the competing constitutional interests *in the context of the facts of each case*, to determine whether the demands of individual privacy clearly exceed the merits of public disclosure." *Missoulian*, 207 Mont. at 529, 675 P.2d at 971 (emphasis added).

¶25 Based on the assumption that most taxpayers have a reasonable expectation that income and financial information provided to the Department will remain private, the Department declared such information, including tax returns, to be confidential, unless it is clear that the taxpayer does not have a protected privacy interest in the information. *See* Rule 42.2.701(3), ARM. Information required to be provided to the Department by taxpayers, including tax returns, as well as some Department-prepared documents that identify taxpayers are deemed confidential under Rule 42.2.701, ARM. This is in direct conflict with the public's right to know contained in Article II, Section 9 of the Montana Constitution.

¶26 Rule 42.2.701, ARM, presumes that all taxpayers have a properly-recognized, constitutionally-protected right to privacy in the information they provide to the Department, which prevails over the merits of public disclosure. In order to determine whether the demands of individual privacy clearly exceed the merits of public disclosure, a balancing of the public's right to know with the individual's right to privacy in the context of the facts of each case is required.

¶27 As conceded by the Appellants in their reply brief in support of their motion for summary judgment, if Rule 42.2.701, ARM, were struck down as facially unconstitutional the Department could, nevertheless, withhold some or all of the requested information if it properly determined in the context of the facts of each particular case that the taxpayer's right to privacy outweighed the merits of public disclosure. For instance, the type of taxpayer involved (i.e., individual, corporate, partnership, etc.), the source of the information provided by the taxpayer, and the public's interest in the information provided are only some of the factors that will need to be considered when determining whether a taxpayer's right to privacy outweighs the public's right to know.

¶28 Conversely, Rule 42.2.701, ARM, declares information to be confidential on a wholesale basis for all taxpayers without balancing the taxpayers' right to privacy with the public's right to know. As a result, we conclude that Rule 42.2.701, ARM, is unconstitutional on its face.

¶29 In light of our determination that Rule 42.2.701, ARM, is unconstitutional on its face, we need not address whether the rule violates the public records statutes. Therefore, Issue 3 will not be addressed.

## ISSUE 2

¶30 Whether the Department may declare coal severance tax information confidential when it had been disclosed for a number of years prior to the promulgation of Rule 42.2.701, ARM?

¶31 Appellants assert that there can be no reasonable expectation of privacy in the information at issue in this case, the average contract sales price for each mine and the taxes paid by each mine. Due to the fact that this information had been made public for nearly 20 years, Appellants argue that this is not information in which members of the coal industry could have an actual expectation of privacy that society is willing to recognize as reasonable.

¶32 The Department, on the other hand, asserts that the District Court correctly determined that the coal severance taxpayers had, and continue to have, a constitutionally protected right of privacy in the information provided to the Department. The Department also asserts that there is sufficient evidence in the record to support the District Court's findings of subjective and objective expectations of privacy on the part of the coal

severance taxpayers in the information at issue.

¶33 Upon denying the parties' cross-motions for summary judgment, the District Court conducted an evidentiary hearing to determine whether the mine operators had a reasonable expectation of privacy in the information provided to the Department and, if so, whether there was a compelling state interest requiring disclosure of that information. Several coal company managers and officers, a certified public accountant, and a bureau chief for the Associated Press testified at the hearing. Based on the evidence and testimony presented, the District Court concluded that the coal severance taxpayers established a subjective and objective expectation of privacy with respect to the information provided to the Department in their coal severance tax returns. In addition, the District Court found that the taxpayers' expectation of privacy outweighed the public's right to know.

¶34 The fundamental issue presented by Appellants is whether the District Court erred when it determined that the coal severance taxpayers had, and continue to have, a constitutionally protected privacy interest in the information they provide to the Department. The issue of whether corporations or other business entities have a right of privacy pursuant to Article II, Section 10 of the Montana Constitution has not been raised by the parties on appeal. Therefore, for purposes of addressing this issue we will assume, without agreeing with the District Court, that corporations have a right of privacy.

¶35 In discussing the adoption and scope of the privacy clause in *Montana Human Rights Division v. City of Billings* (1982), 199 Mont. 434, 440, 649 P.2d 1283, 1286, we noted that the Montana Constitution provides more privacy protection than the United States Constitution. To determine whether a constitutionally protected privacy interest exists under the Montana Constitution, we apply the following two-part test: "whether the person involved had a subjective or actual expectation of privacy and whether society is willing to recognize that expectation as reasonable." *Great Falls Tribune Co. v. Day*, 1998 MT 133, ¶ 20, 289 Mont. 155, ¶ 20, 959 P.2d 508, ¶ 20.

¶36 Pursuant to § 15-35-104, MCA, each coal mine operator is required to compute the severance tax due on each quarter-year's worth of production. Each quarterly statement must include the amount of tonnage produced, the average Btu value of the production, the contract sales price received for the production, and any other information the Department may require. See § 15-35-104, MCA.

¶37 Prior to the adoption of Rule 42.2.701, ARM, in 1994, coal mine operators had no assurance that the information submitted pursuant to § 15-35-104, MCA, would be kept confidential. Unlike the chapters in Title 15 of the Montana Code Annotated involving individual income tax and corporate license or income tax, the chapter involving the coal severance tax does not contain a statutory provision declaring tax records to be confidential. *See* §§ 15-30-303 and 15-31-511, MCA.

¶38 The record reflects that prior to 1994, the Department disclosed certain coal production information in the form of a quarterly coal severance collection summary. Despite this, the testimony of the mine managers and officers at the evidentiary hearing indicated that they were not aware this information had been disseminated by the Department prior to 1994 and that if they had known they would have objected to it.

¶39 However, none of the coal mine managers or officers testified that prior to 1994 they expected the coal severance tax information submitted pursuant to § 15-35-104, MCA, to be kept confidential. They did testify that they would like this information to remain confidential because of the competition in the coal industry today, the problems it might cause with their customers who are paying more than the average price, and the possibility that the information could give their competitors an unfair advantage.

¶40 In response to the coal mine operators' economic concerns, we note that in *Great Falls Tribune Co.*, we concluded that economic advantage is not a privacy interest. *Great Falls Tribune Co.*, ¶ 29. Furthermore, we fail to see how a competitor could determine the contract price of coal for a specific contract from the average contract sales price or the amount of severance tax paid by each mine. The information published before and after the adoption of Rule 42.2.701, ARM, does not reveal the number of contracts a coal mine has nor the type of contracts (i.e., short- or long-term or both). Several factors impact the price of coal paid by a purchaser, including the quality of the coal being purchased, whether the purchaser has a short- or long-term contract, and the transportation costs for delivery of the coal.

¶41 Given the fact that the Department did not restrict access to this information for nearly 20 years and that the coal mine operators within a highly regulated industry were given no assurances that this information would be kept confidential nor did they request that it be kept confidential, we conclude that prior to 1994 the coal mine operators within Montana did not have an actual or subjective expectation of privacy in the information submitted to the Department pursuant to § 15-35-104, MCA.

¶42 Following the adoption of Rule 42.2.701, ARM, the coal mine operators could assert a subjective expectation of privacy in the information provided to the Department pursuant § 15-35-104, MCA. However, a subjective expectation of privacy based on a facially unconstitutional rule is not one society would be willing to recognize as reasonable. We also note that this information had routinely been made available for nearly 20 years prior to the adoption of Rule 42.2.701, ARM. As a result, neither prong of the two-part privacy test has been met, ruling out the existence of a constitutionally protected privacy interest.

¶43 Appellants also assert that they should be awarded their reasonable attorney fees and costs incurred in bringing this action in accordance with § 2-3-221, MCA. Section 2-3-221, MCA, reads as follows:

> **Costs to plaintiff in certain actions to enforce constitutional right to know.** A plaintiff who prevails in an action brought in district court to enforce his rights under Article II, section 9, of the Montana constitution may be awarded his costs and reasonable attorneys' fees.

We have already concluded that Rule 42.2.701, ARM, is unconstitutional on its face because it does not balance the public's right to know with the taxpayers' right to privacy on a case-by-case basis in violation of Article II, Section 9 of the Montana Constitution. Hence, the Appellants have performed a service for the citizens of the State by enforcing a portion of our Constitution that would otherwise be violated. Due to the public benefits gained by Appellants' efforts, the cost of the litigation should be spread among its beneficiaries. *See Associated Press v. Board of Pub. Educ.* (1991), 246 Mont. 386, 393, 804 P.2d 376, 380. Therefore, we remand this matter to the District Court pursuant to § 2-3-221, MCA, for an award of costs and reasonable attorney fees incurred by Appellants in bringing this action, including the fees and costs incurred on appeal.

¶44 Reversed and remanded.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

/S/ KARLA M. GRAY

Justice James C. Nelson specially concurs.

## Introduction

¶45 I concur in the result of our opinion. I would, however, reach the issue of whether the corporate coal company taxpayers and other non-human entities in this state enjoy the right of *individual* privacy which is guaranteed under Article II, Section 10, of Montana's Constitution and which is excepted from the right-to-know provision, Article II, Section 9. Having reached this issue, I would hold that only individuals, not corporations and other non-human entities, enjoy this constitutional right.

¶46 It is necessary that we address this important issue for two reasons. First, the trial court's decision was premised on a legal conclusion--i.e., that the corporate taxpayers had and continue to have a reasonable expectation of privacy, guaranteed by Article II, Section 10, of Montana's Constitution, which must be balanced against and, as it turned out here, trumps the public's right to know, guaranteed under Article II, Section 9. While the court was following Montana case law as it presently exists, the legal underpinnings of the court's basic premise--that corporations enjoy a constitutionally-guaranteed right of privacy--is wrong, as I will demonstrate in this separate opinion.

¶47 Second, the Department's regulation, which we have now declared facially unconstitutional, likewise presupposes that non-human taxpayers are guaranteed the right to *individual* privacy under Montana's Constitution. It thus logically follows that when the Department adopts a new version of this regulation, presumably the replacement rule will be bottomed in this same fundamental, but legally flawed, premise. Just as important, while we have declared that the Department's regulation is facially unconstitutional for failing to incorporate an Article II, Section 9, balancing test, such a test, even if included in an amended rule, will be meaningless as to non-human taxpayers. These taxpayers have no constitutional privacy right to "balance" against the public's right to know.

¶48 Since the rule is the focus of our decision, I begin there.

I.

¶49 As our opinion and the plain language of the Department's regulation clearly demonstrate, Rule 42.2.701, ARM, purports to deny public access to taxpayer information because "[t]he Montana Constitution guarantees individuals *and corporations* the right to privacy in Article II, Section 10." Rule 42.2.701(1), ARM (emphasis added). Indeed, it is "[u]nder this provision of the Constitution . . ." in conjunction with Montana statutes, that the Department has determined it "will protect the privacy interests of taxpayers." Rule 42.2.701(1), ARM. Further, it will balance the public's right to know against the individual right of privacy, and that it will opt for confidentiality "unless it is clear that a taxpayer does not have a protected privacy interest in information found in the documents." Rule 42.2.701(2) and (3), ARM. Finally, grounding its determination in "the Montana Constitution," the Department then goes on to classify by way of example certain information as confidential and other information as not confidential. Rule 42.2.701(5), ARM.

¶50 While, as I will explain in more detail later, individuals are clearly guaranteed the right of privacy set out in Article II, Section 10, of Montana's Constitution (and excepted from the right-to-know provision, Article II, Section 9), it is equally clear that this right is constitutionally guaranteed *only* to individuals and not to other non-human entities--for example, corporations, firms, partnerships, associations, organizations, institutions, and governments, their agencies and subdivisions.

¶51 Article II, Section 10, guarantees "the right of *individual* privacy;" likewise, the Article II, Section 9 exception to the public's right to know applies only with respect to matters involving "*individual* privacy" (emphasis added). While non-human entities may enjoy confidentiality in some of their property interests under Montana statutory law--the Uniform Trade Secrets Act, Title 30, Ch. 14, part 4, serves as one example--and under some sections of the federal and state constitutions--the protection against the "taking" of private property for public use without just compensation, comes to mind--these rights of confidentiality are not grounded in "privacy" under Article II, Section 10, nor are such rights excepted from public disclosure by reason of the individual privacy provision of Article II, Section 9. The privacy protection afforded by Article II, Sections 9 and 10, is limited to individuals--i.e, to human beings.

¶52 It is for this reason that the Department's present regulation is fundamentally flawed in lumping human and non-human taxpayers together for constitutional privacy purposes.

Notwithstanding, whatever rights of confidentiality the two different classes of taxpayers enjoy in their tax filings with the Department, as a matter of law, corporations and other non-human taxpayers may not look to Article II, Section 10, and Article II, Section 9, for protection of those filings from public disclosure.

¶53 That the Department failed to recognize this legal distinction in drafting its regulation is understandable. The Department, no doubt, took its lead from this Court which, unfortunately, has been similarly indiscriminate in its jurisprudence and interpretation of Montana's constitutional right to know and right of individual privacy.

¶54 Therefore, and with that in mind, I will begin with some general observations about the Constitution itself.

## II.

¶55 If it is anything, the 1972 Constitution of Montana and, in particular, its Article II Declaration of Rights is a compact with the people. The Declaration of Rights serves as a shield to protect each individual from the excesses of government, from the tyranny of the majority, and from the sorts of abuses perpetrated by persons, firms, corporations, associations, organizations, and institutions that, in pursuit of their own interests and agenda, effectively would deprive the people of those things essential to their humanity and to their lawful individual pursuits. As we observed in *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364:

> Montana's Constitution, and especially the Declaration of Rights, is not simply a cook book of disconnected and discrete rules written with the vitality of an automobile insurance policy. Rather, our Constitution, and in particular its Declaration of Rights, encompasses a cohesive set of principles, carefully drafted and committed to the abstract ideal of just government. It is a compact of overlapping and redundant rights and guarantees.

*Armstrong, ¶ 71 (citation omitted).*

¶56 In the words of the framers, Article II of the Constitution, contains the "fundamental principles and rights guaranteed *to the people* by their government." Montana Constitutional Convention, Vol. II, at 579 (emphasis added). Indeed, from the context of the language used and, just as often, from the plain language itself, it is clear that many of

the rights set out in Article II are rights guaranteed to human beings and not to non-human entities.

¶57 To be specific, Article II, Section 2, provides that "[t]he people" have the exclusive right to govern themselves. Captioned "Inalienable rights," Article II, Section 3, while using the broader term "persons" nonetheless, in context, refers to human beings: "All persons are born free . . . ." Only human beings are "born free."

¶58 Article II, Section 4, is even more explicit. Captioned "Individual dignity," this section guarantees that "[t]he dignity of the human being is inviolable. No person shall be denied equal protection of the laws." And to drive this "people" right home, this same section explicitly prohibits discrimination against any person by the state "any person, firm, corporation, or institution . . . in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas." Again, only human beings share attributes of race, color, sex, culture, and social origin or condition, and only human beings can be discriminated against on the basis of these attributes. In guaranteeing persons equal protection of the laws and in protecting them against discrimination based on human-only conditions, the framers specifically prohibited both human *and* non-human entities from engaging in discriminatory conduct. Again, in context, "persons" refers to human beings.

¶59 Article II, Section 6, guarantees freedom of assembly to "[t]he people." Article II, Section 7, guarantees freedom of speech, expression, and the press to every "person"-- person being qualified by the pronoun "he" which can, again, only refer to human beings. Article II, Section 8, guarantees the right of public participation to "[t]he public." Article II, Sections 9 and 10, will be discussed in more detail later but are similarly worded to refer only to human beings.

¶60 Article II, Section 11, provides protection from unreasonable searches and seizures to "[t]he people." Any "person" has the right to bear arms in defense of "his" home, person and property under Article II, Section 12. Article II, Section 15, guarantees the rights of adults to "persons" under age 18. Article II, Section 16, guarantees open courts, a speedy remedy and full legal redress to every "person" for injury to "person, property, or character." Again, the word person is qualified by "his" indicating that the rights guaranteed are "people" rights.

¶61 Similarly, Article II, Section 17, guarantees due process of law to "person[s]" and

Article II, Section 21, makes the guarantee of bail to "[a]ll persons." Article II, Section 23 protects "person[s]" from being imprisoned to secure testimony, except as specified. The rights of "persons" accused of crimes set out in Article II, Section 24, are qualified by the pronoun "him" or "his." Article II, Section 25, guarantees that "[n]o person shall be compelled to testify against himself . . . [nor] again put in jeopardy for the same offense previously tried in any jurisdiction." Article II, Section 27, provides protection to "person [s]" against imprisonment for debt.

¶62 Article II, Section 30, protects "person[s]" from being charged and tried for treason except as specified. This section also protects the estates of suicides--again, suicide being uniquely human. Article II, Section 34, reserves unenumerated rights to "the people." And, finally, Article II, Section 35, allows special consideration to servicemen, servicewomen, and veterans.

¶63 There are, however, a few notable exceptions to the "people" orientation of the Declaration of Rights. Article II, Section 26, guarantees the right of a jury trial "to all." This section also refers to the "parties" which can, of course, include human beings and non-human legal entities as well. Similarly, Article II, Section 29, prevents private property from being taken for public use without just compensation to the "owner" without qualification as to whether the owner is human or non-human. Likewise, Article II, Section 31's prohibitions against *ex-post facto* laws, irrevocable grants of special privileges, and franchises or immunities, and its protection of contractual obligations is not limited to human beings nor is Article II, Section 32's prohibition against quartering soldiers in a house without the consent of the "owner."

¶64 I make the point that, in many respects, the Declaration of Rights is a guarantee of rights to *the people*--i.e., to human beings--because, in our task of interpreting and applying the various rights of Article II in actual cases and controversies, we occasionally lose sight of this fundamental principle. We fail to ask some threshold questions. Whose right is this? Who has standing to assert this right? Is this a right which protects just *people* or is this right also enjoyed by non-human entities, as well? With only a result in mind and often driven by the issues as framed by the parties or the trial court's analysis; or, sometimes, to resolve some perceived, though false conflict, or to "balance" theoretically competing rights, we, on occasion, grant wholesale to entities other than *the people*, fundamental Article II rights that such non-human entities are not entitled to enjoy under the plain language of the section or sections at issue.

¶65 I make this criticism being the first to admit that I have signed some of these opinions. Moreover, I acknowledge that the U. S. Supreme Court has, in certain circumstances, interpreted the Federal Constitution's Bill of Rights and amendments so as to include corporations within the term "persons." *See*, *e.g*, *First National Bank of Boston v. Bellotti* (1978), 435 U.S. 765, 780 n.15, 98 S.Ct. 1407, 1418, 55 L.Ed.2d 707 (stating that "corporations are person within the meaning of the Fourteenth Amendment" and citing *Santa Clara County v. Southern Pacific R. Co.* (1886), 118 U.S. 394, 6 S.Ct. 1132, 30 L. Ed. 118). *But see United States v. White* (1944), 322 U.S. 694, 698-99, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (identifying Fifth Amendment privilege against self-incrimination as "essentially a personal one, applying only to natural individuals" and cannot be utilized by or on behalf of "any organization, such as a corporation"); *California Bankers Ass'n v. Shultz* (1974), 416 U.S. 21, 65-67, 94 S.Ct. 1494, 1519-20, 39 L.Ed.2d 812 (denying constitutional right of privacy to corporation).

¶66 Furthermore, I recognize that the decisions of this Court for more than a century have tracked with federal precedent regarding the inclusion of corporations as "persons" under Montana's due process clause. *See Helena Consol. Water Co. v. Steele* (1897), 20 Mont. 1, 9, 49 P. 382, 384 (quoting Michigan court decision that "[t]he constitutional principle that no person shall be deprived of property without due process of law applies to artificial persons as well as natural . . ."); *Montana Power Co. v. Public Service Com'n* (1983), 206 Mont. 359, 364, 671 P.2d 604, 607 (stating that corporations are included within the definition of "persons" for purposes of Article II, Section 4 (equal protection) and Article II, Section 17 (due process), as well as the Fourteenth Amendment). *See also accord, GBN, Inc. v. Montana Dept. of Revenue* (1991), 249 Mont. 261, 815 P.2d 595; *D & F Sanitation Service v. City of Billings* (1986), 219 Mont. 437, 713 P.2d 977; and *Tipco Corp., Inc. v. City of Billings* (1982), 197 Mont. 339, 642 P.2d 1074.

¶67 It is not my purpose here to revisit these decisions--there may or may not be legally sufficient reasons why "persons" in one section of Article II includes only natural persons, but in another includes both natural and non-natural persons. I only suggest that in resolving cases we sometimes paint the protections afforded by the Declaration of Rights with a broad brush and with little analysis of whether the right or rights at issue were meant to protect only human beings--in furtherance of the *people* orientation of Article II-- or, more broadly, both human and non-human entities alike.

¶68 The case at bar has brought this observation into glaring focus. It is for this reason I conclude that we must address the issue of judicially-created, constitutionally-guaranteed

"corporate privacy," or, in default of doing so, simply add further support to an already substantial body of flawed precedent.

¶69 Again, it is not my purpose here to take this argument beyond Article II, Sections 9 and 10. I am hopeful, however, that having raised this issue here, future cases will permit us the opportunity to address this argument in a majority opinion not only as to Sections 9 and 10, but, when appropriate, in other Article II contexts, as well.

¶70 That said, I turn next to our case law, for that is where this problem began.

### III.

¶71 The notion that corporations are guaranteed privacy under Article II, Section 9 (and, therefore, necessarily, under Section 10), was first introduced into Montana law in *Mountain States Tel. & Tel. Co. v. Department. of Pub. Serv. Reg.* (1981), 194 Mont. 277, 634 P.2d 181. There, the utility sought to preserve the confidentiality of claimed trade secrets and proprietary and confidential information in a rate proceeding before the Public Service Commission (PSC). The PSC--correctly in my view--ruled that a corporation is not entitled to the protection of the individual privacy exception under Article II, Section 9, of Montana's Constitution and, therefore, denied Mountain Bell's motion for protective order.

¶72 In a proceeding for judicial review and declaratory relief, the District Court, the Hon. Gordon Bennett, agreed with the PSC, but concluded that other provisions of Article II were available to protect the utility's legitimate property interests. Moreover, the trial court observed that, even despite the utility being excluded from the protection of the privacy exception to Article II, Section 9, the PSC could still have issued a protective order to preserve Mountain Bell's other constitutional rights in its confidential and proprietary information. *See Mountain States*, 194 Mont. at 280-81, 634 P.2d at 183-84.

¶73 On appeal, we first determined that a trade secret is constitutionally protectable property. *Mountain States*, 194 Mont. at 283-84, 634 P.2d at 185-86. Then, without reference to, much less any analysis of, the Constitutional Convention (Con-Con) history leading to the framers' inclusion of the right of individual privacy in Article II, Sections 9 and 10, we concluded that since an individual might claim a constitutional privacy interest in a trade secret and, thus, take advantage of the right to know exception in Article II, Section 9, that "a corporate owner of a trade secret is entitled to the same exception."

*Mountain States*, 194 Mont. at 284, 634 P.2d at 186. We stated:

> [T]he provisions of our state constitution and statutes, when applied to deny the protective order in this case, have the effect of violating, as applied, the equal protection clause of the Fourteenth Amendment of the federal constitution, and the due process clauses of the state and federal constitutions, [leaving] for decision to some other case and time whether the remaining constitutional arguments of Mountain Bell have validity.

*Mountain States, 194 Mont. at 283, 634 P.2d at 185.*

¶74 We also stated that:

> Our state constitution also guarantees due process, 1972 Mont. Const., Art. II, § 17, and equal protection of the laws, Mont. Const., Art. II, § 4. The application by the PSC of Montana's right to know provision in this instance created a conflict of that provision with due process and equal protection clauses of the state constitution.

*Mountain States, 194 Mont. at 288, 634 P.2d at 189.*

¶75 The *Mountain States* Court correctly asserted that the federal due process rights of Mountain Bell may very well have been at stake, in that the corporation was being deprived of its property--trade secrets--without due process. The Court could have and should have stopped there. We should have turned strictly to those provisions of the federal constitution and disposed of the case on that basis.

¶76 We went further, however. We noted that "the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution also conflict with Montana's right to know provision as applied here by the PSC." *Mountain States*, 194 Mont. at 288, 634 P.2d at 189. We also concluded:

> By holding that the due process clause of the Fourteenth Amendment and the due process clause of the Fifth Amendment require us to provide protection to Mountain Bell for its trade secrets to the extent not necessary for regulation, we confirm the police power of the state to regulate utilities, we resolve the seeming internal conflict in our state constitution created by the PSC in the application of the right to know provision, and we pay due accord to the due process requirements of the U. S.

Constitution.

*Mountain States, 194 Mont. at 288-89, 634 P.2d at 189.*

¶77 The problem with this approach was that we did not need to find a conflict between the Fifth and Fourteenth Amendments and Article II, Section 9, to resolve the case on federal due process grounds. We needed only to recognize that the privacy right included in this latter section did not provide protection to non-human entities; but that, by virtue of the Federal Constitution's Article III "Supremacy Clause," Mountain Bell's trade secrets were, nevertheless, clearly protected under the federal constitution. We could have disposed of the case by simply remanding for entry of an appropriate protective order grounded in due process.

¶78 Nevertheless, since the issue as framed by the PSC and Mountain Bell focused solely on the right of privacy under Article II, Section 9, we apparently felt compelled to resolve the case on that basis. Our vehicle to accomplish this, as already noted, was to find a conflict between Mountain Bell's federal and state due process and equal protection rights and the right of privacy in Article II, Sections 9 and 10. *See Mountain States*, 194 Mont at 288, 634 P.2d at 188-89.

¶79 Contrary to our analysis, however, there existed no irreconcilable conflict between Article II, Section 9, and either constitutional due process or equal protection. Article II, Sections 9 and 10, protect only individual privacy interests. Neither section protects "corporate privacy." More importantly, nothing in Article II, Section 9, requires disclosure of proprietary or confidential information where that data is protected from disclosure elsewhere in either the federal or state constitution. The right-to-now provision of Article II, Section 9, like other constitutional rights, is not absolute. "It can be properly circumscribed when the right or interest against which it competes is weighty or compelling." *State ex rel. Smith v. District Court* (1982), 201 Mont. 376, 383, 654 P.2d 982, 986.

¶80 Instead of relying strictly on constitutional due process to protect Mountain Bell's trade secrets, we approached the case strictly as presented and with the mind set that Article II, Section 9, right to know trumped all other constitutional rights except the right to individual privacy. We thus created for ourselves a Hobson's choice. Unless we interpreted Article II, Section 9, so as to grant corporations the same right of privacy that individuals were constitutionally guaranteed under Article II, Section 10, then the legitimate corporate property interests of Mountain Bell could not be protected. This

approach was wrong.

¶81 Indeed, this is the exact opposite of the approach we took in *Smith*. There we determined that Article II, Section 9's guarantee was "not absolute" and held that the public's constitutional right to know did not abrogate the defendant's equally important constitutional right to a fair trial. *Smith*, 201 Mont. at 383-385, 654 P.2d at 986-987. *See also State ex rel. the Missoulian v. District Court* (1997), 281 Mont. 285, 304, 933 P.2d 829, 841 (determining that the media's Article II, Section 9, right to know and First Amendment and Article II, Section 7, right to free speech may be restricted to the extent necessary to protect a defendant's Article II, Section 24, right to the selection of an impartial jury). In reaching our conclusion in *Smith*, however, we effectively "balanced" Section 9 with the First and Fourteenth Amendments, and concluded:

> Based upon the Right to Know provision of the Montana Constitution and the right of access recognized under the First and Fourteenth Amendments to the United States Constitution, we hold that the public and press may be excluded from a pretrial suppression hearing only if dissemination of information acquired at the hearing would create a clear and present danger to the fairness of defendant's trial and no reasonable alternative means can be utilized to avoid the prejudicial effect of such information.

*Smith, 201 Mont. at 385, 654 P.2d at 987.*

¶82 *Smith* reached the correct result and established that--like all constitutional rights--the right to know under Article II, Section 9, is not absolute. This right is textually limited by the right to individual privacy and, as suggested above, may simply not trump, without more, other constitutionally protected interests. However, I also suggest that unless a person can establish that a right to a fair trial embodies a privacy interest, Section 9 "balancing" is inappropriate. The right to a fair trial--like the right to due process--is an entirely separate issue, and the two should be kept separate.

¶83 Had we used the correct approach in *Mountain States*, we could have protected Mountain Bell's legitimate trade secret information under the due process provisions of the federal constitution. More importantly, there would have been no necessity to read into Article II, Sections 9 and 10, a protection for "corporate privacy" which clearly was neither supported by the plain language of either section nor--as we shall see--intended by the constitution's framers.

¶84 But we did not use the correct approach and, as night follows day, bad decisions create bad precedents.

¶85 The "corporate privacy" issue next came before this Court in *Belth v. Bennett* (1987), 227 Mont. 341, 740 P.2d 638. That case--an appeal from a decision from the same District Judge as in *Mountain States*--involved the State Auditor and Commissioner of Insurance's refusal to furnish an Indiana resident and magazine editor access to rating reports filed with her office and prepared by the National Association of Insurance Commissioners (NAIC) to assist insurance company regulators nationwide. *See Belth*, 227 Mont. at 343, 740 P.2d at 639-40. The trial court, consistent with its approach in *Mountain States* ruled, among other things, that a corporation could not assert the right of privacy exception to Article II, Section 9, and that, while '"[t]here is a constitutional presumption that all documents of every kind in the hands of public officials are amenable to inspection, regardless of legislation, special exceptions [are] made to accommodate the exercise of constitutional police power and other competing constitutional interests, such as due process."' *Belth*, 227 Mont. at 344, 740 P.2d at 640. Again, Judge Bennet had it right.

¶86 Notwithstanding, we summarily reversed the District Court, holding that a corporation, "as well as a natural person," can assert the right of privacy exception to the constitutional right to know. *Belth*, 227 Mont. at 345, 740 P.2d at 640-41 (citing *Mountain States*).

¶87 While our ruling simply perpetuated the erroneous approach of *Mountain States*, the quoted language suggests another apparent point of confusion in our opinions. In both *Mountain States* and in *Belth* we made the mistake of equating corporations as "persons" with "natural persons"-- i.e., individuals. It is clear that a corporation is a "person" for due process and equal protection purposes under federal constitutional law. *See Mountain States*, 194 Mont. at 288, 634 P.2d at 188 (citing *First Nat. Bank of Boston* (1978), 435 U. S. at 780, 98 S.Ct. at 1418). But it is equally clear, as I will demonstrate later, that a corporation is not an individual (i.e., a natural person) for privacy purposes. Under the law, "persons" and "individuals" or "natural persons" are not one and the same. This important distinction, though evidently overlooked by this Court, was not lost, as we shall see, on the framers of our state constitution.

¶88 *Belth*, however, was not the last case to make this mistake. Our decision in *PacifiCorp v. Department of Revenue* (1992), 254 Mont. 387, 838 P.2d 914, addressed whether the Department of Revenue (DOR) could refuse to disclose to the corporate taxpayer

information about the taxpayer obtained by and from the Multistate Tax Commission (MTC). DOR sought to assert the MTC's right of "corporate privacy" against PacifiCorp's right to know in the same fashion that we had allowed the Auditor to assert NAIC's privacy right in *Belth. PacifiCorp*, 254 Mont. at 394-95, 838 P.2d at 918.

¶89 As we did in *Belth*, we simply acknowledged without further question that corporations enjoy the right to know and the right of privacy protected under Article II, Sections 9 and 10. We ruled, however, that MTC was not a corporation but was properly classified as an "instrumentality of state government." Having made that observation we then went on to state:

> PacifiCorp's right to know prevails because no individual or corporate privacy is involved. Montana, California, and MTC cannot assert the right to privacy. They are not "individuals" under Montana law--they are government entities.

*PacifiCorp, 254 Mont. at 395, 838 P.2d at 918-19.*

¶90 Obviously, we were correct in our conclusion that governmental entities are not "individuals." The point we failed to recognize was that corporations are not "individuals" either. More importantly, had we not been hamstrung with the erroneous holdings of *Mountain States* and *Belth* confusing the status of corporations as "persons" with "individuals" (natural persons) and granting corporations rights to individual privacy under Montana's Constitution, neither DOR nor MTC would have been able to argue that right in improperly attempting to withhold from the taxpayer the taxpayer's own file.

¶91 Our next case implicating the *Mountain States* "conflict" between Article II, Sections 9 and 10, came with our decision in *Great Falls Tribune Co., Inc. v. Great Falls Pub. Sch.* (1992), 255 Mont. 125, 841 P.2d 502 (*Great Falls Tribune I*). In that case we ruled the statutory exception to the open meeting law, § 2-3-203(4), MCA, was unconstitutional under the right-to-now provision of Montana's Constitution, Article II, Section 9. *Great Falls Tribune I*, 255 Mont. at 131, 841 P.2d at 505.

¶92 In doing so we first noted that Article II, Section 9, is "unambiguous and capable of interpretation from the language of the provision alone." *Great Falls Tribune I*, 255 Mont. at 129, 841 P.2d at 504 (citing *Great Falls Tribune v. District Court* (1980), 186 Mont. 433, 608 P.2d 116; *Associated Press v. Board of Education* (1991), 246 Mont. 386, 804 P.2d 376). We also rejected the School Board's invitation--grounded in *Mountain States*--

to balance the public's right to know under Article II, Section 9, against the Board's Article X, Section 8, right to control and supervise schools within the district.

¶93 We rejected this argument, for among other reasons, that in *Mountain States* we determined that "a corporation's trade secrets were a matter of individual privacy and that because trade secrets are constitutionally protected property rights, on balance, they exceeded the merits of full public disclosure." We then summarily disposed of the argument observing that, in the matter at issue, no individual privacy rights were involved. *Great Falls Tribune I*, 255 Mont. at 129-30, 841 P.2d at 505.

¶94 While that statement was correct as far as it went, there were no individual privacy rights at issue in *Mountain States* either. The right to individual privacy was no more constitutionally guaranteed to the Board (or to DOR or MTC in *PacifiCorp*) than it was to Mountain Bell in *Mountain States* or to NAIC in *Belth*. Quite simply, the focus of the case should not have been on individual privacy rights. The school board did not have any. The real issue was whether the public's constitutional right to know would prevail against some other constitutional right that might arguably have allowed the school board to close its collective bargaining negotiations. *See Great Falls Tribune I*, 255 Mont. at 131-139, 841 P.2d at 505-510 (Weber, J., dissenting). While I agree with the result reached by the majority in *Great Falls Tribune I*, I cannot agree with its rationale.

¶95 Our next decision, *Montana Health Care Ass'n v. Board of Directors* (1993), 256 Mont. 146, 845 P.2d 113, needs to be mentioned only because we summarily reaffirmed that "corporations have a right of privacy." *Montana Health Care*, 256 Mont. at 151, 845 P.2d at 116 (citing *Belth* and *Mountain States*). We concluded that the privacy rights of employers and employees in payroll and claims-specific information--as asserted by the State Fund--did not clearly exceed the merits of public disclosure of that information. We remanded for a *Mountain States*-type protective order. *Montana Health Care*, 256 Mont. at 152, 845 P.2d at 117.

¶96 The "corporate privacy" issue aside, the extent to which actual individual privacy interests were implicated in the request for the particular information sought cannot be discerned from our decision. More to the point, however, if there were no individual privacy interests at risk, then, but for *Mountain States* and *Belth*, "corporate privacy" would not have prevented disclosure of the information.

¶97 Moreover, it is interesting to note that we began our discussion of the privacy issue by

citing *Allstate Insurance Co. v. City of Billings* (1989), 239 Mont 321, 325, 780 P.2d 186, 188, for the proposition that "[t]he only limitation on the public's right to receive information is the constitutional right of privacy." Actually the constitutional right is to *individual* privacy and if *individual* privacy rights were not at issue, then the right to privacy would not have precluded the State Fund from simply giving the Montana Health Care Association the information it requested. Again, the notion of "corporate privacy" created from whole cloth in *Mountain States* merely served to frustrate and complicate the public's legitimate right to know.

¶98 Finally, in *Great Falls Tribune Co. v. Day*, 1998 MT 133, 289 Mont. 155, 959 P.2d 508 (*Great Falls Tribune II*), we addressed a situation where the Department of Corrections sought to assert the privacy interests of private vendors in their proposals to build a private prison against the media's attempt to attend DOC committee meetings where these proposals were deliberated. *Great Falls Tribune II*, ¶ 1. In our discussion we reiterated our previous holding that corporations do have an interest in privacy protected by the Montana Constitution and that a governmental agency can assert this right on behalf of a private interest. *Great Falls Tribune II*, ¶ 21 (citing *Belth*). We also observed that, based on *Mountain States*, the plaintiff Great Falls Tribune had conceded that the corporate vendors did have a constitutional privacy interest in their trade secrets and that privacy interest was an exception to the Article II, Section 9, right to know. *Great Falls Tribune II*, ¶ 23.

¶99 In that posture we decided the case on privacy grounds determining that the vendors had no actual expectation of privacy in their proposals, other than trade secrets, and that, therefore, there was no privacy interest to balance against the public's right to know. We did, however, reaffirm that corporations have a constitutional privacy interest in trade secrets under Mountain States. *Great Falls Tribune II*, ¶ 33.

¶100 Once again, while we decided the case as presented and based on *Mountain States* and its progeny, the simple fact is that had *Mountain States* been decided correctly, the "corporate privacy" argument would not have been at issue in *Great Falls Tribune II*. The vendors' legitimate trade secrets could have been protected from public access under other provisions of the United States Constitution or, perhaps, under the Montana Constitution, and we would not have had to engage in privacy analysis as regards the information in the proposals that were ultimately subject to public inspection. Again, there simply would have been no "privacy" interest that the vendors or DOC on the vendors' behalf could have asserted in frustration of the public's legitimate right to know.

¶101 Given this jurisprudential history of "corporate privacy" in Montana, it is long overdue that the decisions of this Court return to and give effect to the actual language of Article II, Sections 9 and 10, and to the framers' intent. My analytical approach requires that we examine both carefully. Having done so, I suggest that, once and for all, we dispose of the notion that corporations and entities other than individuals are guaranteed the right to individual privacy set out in those two sections of Montana's Constitution.

¶102 With that approach in mind, I now examine the plain language of Article II, Sections 9 and 10, and the Con-Con history of each.

## IV.

¶103 Article II, Section 10, of Montana's Constitution provides:

> **Right of privacy.** The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

¶104 Article II, Section 9, of Montana's Constitution provides:

> **Right to know.** No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

¶105 The matter of who was guaranteed this right of privacy under Section 9 came directly before the framers at the Con-Con with the following exchange:

> DELEGATE HELIKER: Mr. Dahood, being an ignorant nonlawyer, what is an individual?
>
> DELEGATE DAHOOD: What is an individual?
>
> DELEGATE HELIKER: Is it by any chance also a corporation?
>
> DELEGATE DAHOOD: A person can, of course, Dr. Heliker, as you well know, be defined to include a corporation under the law.

DELEGATE HELIKER: I know a person can, but can an individual?

DELEGATE DAHOOD: An individual, in my judgment, would not be a corporation, no.

Montana Constitutional Convention, Vol. V, 1680. Following this discussion the Con-Con delegates adopted Section 9 in the language set out above. *See* Montana Constitutional Convention, Vol. V, at 1669-1680.

¶106 They then proceeded to the discussion of Article II, Section 10, which, at that point in the proceedings read as follows:

The right of privacy is essential to the well being of a free society and shall not be infringed without the showing of a compelling state interest.

Montana Constitutional Convention, Vol. V, at 1680. The following discussion then took place:

DELEGATE CAMPBELL: Mr. Chairman, fellow delegates, the right of privacy is a right which is not expressly stated in either the United States or the Montana Constitution. It is our feeling, on the Bill of Rights Committee, that the times have changed sufficiently that this important right should now be recognized. If I may, Mr. Chairman, I would like to add an amendment which the committee has made, and I would like it voted on before I continue. This would be to the--add to Section 10 the right of individual privacy.

\* \* \*

DELEGATE CAMPBELL: Yes Mr. Chairman, and the committee has unanimously approved this amendment and would request a vote on it if necessary.

CHAIRMAN GRAYBILL: So many as shall be in favor of adding the word "individual" so that it reads: "the right of individual privacy", as the committee wishes to have this matter considered, please say Aye.

Thereupon, the delegates approved this amendment with no dissenting votes. Montana Constitutional Convention, Vol. V, at 1680-81.

¶107 The discussion continued, however.

> DELEGATE BABCOCK: May I ask a question, please? Would this preclude a corporation made up of family members?
>
> DELEGATE CAMPBELL: It's not--it is intended to protect the individual as we have described it. We do not feel that a corporation is an individual. It can be considered a person, but not an individual. We don't think that this would apply in that area.

¶108 Montana Constitutional Convention, Vol. V., at 1681. Accordingly, from the foregoing discussion of the delegates at the Con-Con it is clear that they carefully chose the constitutional right of privacy to be a guarantee applicable to individuals only. They adopted the language of Article II, Sections 9 and 10, fully aware of and intending that this right of individual privacy would not apply to corporations.

¶109 Unfortunately, this fundamental point of constitutional history was seemingly lost in our rush in *Mountain States*, to judicially grant corporations a constitutional right of privacy equivalent to that guaranteed to individuals. Nevertheless, it is crystal clear not only from the plain language of Article II, Sections 9 and 10, but also from the Con-Con deliberations that the framers never intended that corporations and entities other than individuals--i.e, human beings--would be guaranteed privacy rights under Montana's Constitution. That we summarily read such a right into Article II, Section 9, in *Mountain States* and that we judicially created from whole cloth the constitutional right of "corporate privacy" was wholly improper and beyond our authority. *See* § 1-2-101, MCA (a judge must not insert into a statute that which is omitted or omit that which is inserted); and *State ex rel. Nelson v. Ninth Jud. Dist. Court* (1993), 262 Mont. 70, 79, 863 P.2d 1027, 1032 (stating that this Court employs the same rules of statutory construction in determining the meaning of a constitutional provision).

¶110 That necessarily leads me to suggest a different approach to cases that involve privacy interests under Article II, Sections 9 and 10.

## V.

¶111 I start from the premise, as demonstrated above, that the protection from disclosure

under Article II, Section 9, is not available to corporations or any other non-human entity. This necessarily raises the issue supposedly laid to rest in *Montana Human Rights Div. v. City of Billings* (1982), 199 Mont. 434, 649 P.2d 1283, where we determined that a governmental entity could assert the privacy rights of its employees. If so, does this mean that all non-human entities may, in similar fashion, vicariously assert individual privacy rights? For example, may a closely-held corporation assert the privacy interests of its shareholder-director, and thereby, essentially, assert a corporate right to privacy even though, as I have set forth here, no such right exists? I suggest that the correct answer involves the doctrine of "standing."

¶112 In *Gryczan v. State* (1997), 283 Mont. 433, 942 P.2d 112, a case involving the constitutional right to privacy under Article II, Section 10, we stated that the following criteria must be satisfied to establish standing: (1) the complaining party must clearly allege past, present, or threatened injury to a property or civil right; and (2) the alleged injury must be distinguishable from the injury to the public generally, but the injury need not be exclusive to the complaining party. *Gryczan*, 282 Mont. at 442-43, 942 P.2d at 118 (citations omitted).

¶113 This standard follows the general principles of standing under the federal constitution, that parties must "rely only on constitutional rights which are personal to themselves." *NAACP v. State of Alabama* (1958), 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488. Thus, we have regularly denied standing to a party bringing a constitutional challenge who could not demonstrate that he or she had or would suffer injury. *See Bowen v. McDonald* (1996), 276 Mont. 193, 204, 915 P.2d 201, 208; *Olson v. Department of Revenue* (1986), 223 Mont. 464, 470-71, 726 P.2d 1162, 1166-67; *Stewart v. Board of County Com'rs* (1977), 175 Mont. 197, 203, 573 P.2d 184, 188.

¶114 We followed this legal principle in permitting a municipality to assert the privacy interests of its employees in *Montana Human Rights Div. v. City of Billings*. In doing so, however, we established a questionable rule.

¶115 We permitted the City of Billings in that case to represent the privacy rights of its employees, whose records it held and wished to protect from disclosure. The records were sought by the Appellant, Montana Human Rights Division. Following the two-part test, we reasoned that because the City, as an entity, could potentially suffer economic harm should it be compelled to release its employees' records--i.e., a lawsuit by its employees--it too satisfied the requisite "injury" for establishing standing. *Montana Human Rights*, 199

Mont. at 443, 649 P.2d at 1288. We followed this rationale in permitting a state entity to assert the privacy rights of insurance companies in *Belth*. Similarly, we recently permitted environmental organizations to assert the rights of their members to a clean and healthful environment under Article II, Section 3, a provision whose language, in context, affords rights to natural persons only, similar to the right of individual privacy. *See MEIC v. Department of Envtl. Quality*, 1999 MT 248, ¶ 45, 296 Mont. 207, ¶ 45, 988 P.2d 1236, ¶ 45.

¶116 The legal principle that affords standing under such circumstances, however, has nothing to do with the real or potential harm that may befall the entity itself should individual constitutional rights be violated. Rather, the principle is derived from the relationship between the entity and the individuals whose rights it seeks to protect. That the entity may be injured is but one factor, and by no means a decisive one, in determining whether it should be afforded standing to assert the rights of individuals who are not named parties. *See NAACP*, 357 U.S. at 459-60, 78 S.Ct. at 1170. Rather, the focus is on the nexus between the entity and the individuals whose rights it wishes to represent before a court. In other words, an entity has standing only to the extent that the individuals comprising the entity have standing, and the entity need not allege any injury to itself. *See UAW v. Brock* (1986), 477 U.S. 274, 281, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (citations omitted). The entity, under the doctrine of "representational standing," merely serves as an appropriate vehicle to better assert the rights of individuals.

¶117 "Representational standing" is a species of the standing rule we recently utilized in *Armstrong v. State*, where we determined that health care providers have standing to assert their own rights as well as those of their patients who were not named parties. *See Armstrong v. State*, 1999 MT 261, ¶ 13, 296 Mont. 361, ¶ 13, 989 P.2d 364, ¶ 13. Under the "representational standing" doctrine, as the U.S. Supreme Court has made clear, an organization or association does not have standing to assert individual rights without actual injury to individual members. *See Sierra Club v. Morton* (1972), 405 U.S. 727, 740-41, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636. Likewise, the U.S. Supreme Court has established a stringent test for determining whether there exists a sufficient nexus between the organization and the individuals. *See Hunt v. Washington State Apple Adver. Comm'n* (1977), 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2 383 (requiring that (1) members must have standing to sue on their own, (2) the interests that the organization seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit).

¶118 The foregoing distinction is critical if this Court eventually determines--as I believe it must--that the term "individual," under Article II, Sections 9 and 10, excludes corporations and all other non-human, non-natural-person entities. If we do so, then the principle that some entities, including corporations, may have standing to assert the privacy rights of individuals must be clearly delineated. Thus far in our jurisprudence, as evidenced by *Montana Human Rights Div. v. City of Billings*, a sound, workable rule has not been set forth.

¶119 In accordance with the foregoing general principles articulated in federal case law, I suggest the following standard for establishing representational standing to assert individual privacy rights pursuant to Article II, Sections 9 and 10. First, the entity must be able to establish the individual's or individuals' standing under the standard set forth in *Gryczan*; second, the entity must be able to show that its relationship with the individual or individuals is one that protects those privacy interests as a regular function of its policies, obligations, or duties; and third, the entity must demonstrate that the remedy sought will inure to the benefit of those individuals who have or potentially will suffer injury. This standard would strike an appropriate balance between the federal standard set forth in *Hunt*, and our own precedent where representational standing has been afforded but not identified as such. *See generally Warth v. Seldin* (1975), 422 U.S. 490, 511-518, 95 S.Ct. 2197, 2211-15, 45 L.Ed.2d 343; *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati* (6th Cir. 1995), 56 F.3d 710, 717-18; *Legal Aid Society of Hawaii v. Legal Services Corp.* (9th Cir. 1998), 145 F.3d 1017, 1030-31.

¶120 By taking the "individual-means-individual" approach to Montana's Constitution as a first step, and then addressing the issue of standing as a second step, *Mountain States* and its progeny can be viewed through a much clearer lens. For example in *PacifiCorp v. Department of Revenue* (1992), 254 Mont. 387, 838 P.2d 914, the messy analysis--i.e., the corporation's right to know prevails because no individual or corporate privacy is involved, since MTC and DOR are government entities--could have been swept aside and replaced with the following analysis: First: were an individual's or "natural person's" privacy rights at issue due to the potential disclosure? If yes, then did MTC or the DOR have a sufficient nexus between their function as an entity and the individual's right of privacy? If yes, then would the remedy sought directly benefit the individuals' alleged injuries? If yes, then MTC and DOR would have had standing to assert the individuals' privacy rights to preclude the corporate taxpayer from obtaining the files. In *PacifiCorp*, since--as we conceded--there were no individual privacy rights being protected, neither MTC nor DOR had standing to assert rights of privacy. PacifiCorp was entitled to its file--

not because MTC and DOR were government instrumentalities without "corporate" privacy rights of their own, but because neither entity did or could establish standing to protect some individual privacy right.

¶121 Thus, this approach would do away with this "corporation vs. government" confusion. For example, the Court in *PacifiCorp* seems to indicate that MTC, as a government entity, "cannot assert the right of privacy." *PacifiCorp*, 254 Mont. at 395, 838 P.2d at 918. The Court in *Belth*, however, stated that a government employer can assert the privacy rights of its employees. *Belth*, 227 Mont. at 345, 740 P.2d at 641. In point of fact, if a corporation or a government entity, under the representational standing doctrine, can demonstrate it has the requisite relationship to protect the privacy rights constitutionally guaranteed to individuals, then it matters not which sort of non-human entity asserts those rights.

¶122 Similarly, such cases as *Great Falls Tribune Co., Inc. v. Great Falls Pub. Sch.* (1992), 255 Mont. 125, 841 P.2d 502, could be more cleanly decided. Absent the Board establishing standing to protect individual privacy rights, we would never have had to reach the argument of whether the Board could claim its own "individual" privacy rights in attempting to keep the press out.

¶123 This same analysis clarifies the dispute in *Montana Health Care Ass'n v. Board of Directors* (1993), 256 Mont. 146, 845 P.2d 113. There, the appellant corporation invoked the right to know, under Article II, Section 9; likewise, the government entity invoked the right to privacy under Article II, Sections 9 and 10. Both rights were, essentially, presumed.

¶124 Under the analysis suggested here, without initially demonstrating its standing to protect individual privacy rights, the government could not have refused to provide the information requested.

¶125 Most recently, in *Great Falls Tribune II*, the State Department of Corrections and its potential corporate prison "vendors," simply would have no right of privacy under Article II, Section 10. The State, therefore, could only argue, in an Article II, Section 9, action brought on behalf of the "public," that the information sought did not emanate from a "deliberation" of a public body. Rather, the "negotiations" between the State and the vendors were not the kind of deliberations that the framers intended to keep open to the public via Article II, Section 9. This argument failed.

¶126 In turn, the parties that should have brought an action were the vendors. The vendors could assert trade secrets, or a similar property interest, under the Fifth and Fourteenth Amendments. This would have been the vendors' cause of action. The State had no standing, on the vendors' behalf, to assert "corporate privacy" rights that the vendors themselves were not constitutionally guaranteed. Again, no *individual* privacy rights were at stake and, hence, the government could not claim standing to protect those rights.

¶127 Finally, applying this approach in the case at bar, the corporate taxpayers have no privacy rights in their tax information under Article II, Section 9. For that reason, DOR has no standing to assert, on the corporate taxpayers' behalf, constitutional privacy rights that such non-individual entities are not able to claim for themselves. That is not to say that the corporations, as plaintiffs in their own right, might not be able to demand some other form of constitutional protection to maintain the confidentiality of their tax information. No one has advanced such a claim, however, and, accordingly, the further development of that argument must await a future case. The case *sub judice* was litigated and argued on the basis of corporate privacy considerations, and that is how it must be resolved.

## VI.

¶128 In conclusion, and, with all due regard for *stare decisis*, I must agree with Winston Churchill who is reported to have observed: "If you simply take up the attitude of defending a mistake, there will be no hope of improvement." It is time to undo the mistake we made in *Mountain States*. Based on the foregoing, I would overrule *Mountain States* and its progeny to the extent that our decisions judicially created and granted the constitutional right of individual privacy to corporations and, by implication, to other non-human entities.

¶129 It is time that we re-interpret the plain and unambiguous language of Article II, Sections 9 and 10, in the manner originally intended by the Con-Con delegates. The right of privacy protected under Montana's Constitution is a right guaranteed to *individuals* only. It is uniquely a "people" right. It is a right which may be enjoyed only by "natural persons"--i.e., by human beings.

¶130 If a corporation or other non-human entity seeks to claim rights of *individual* privacy then, necessarily, such claims must be based on the corporation or non-human entity demonstrating representational standing via a sufficient nexus with individuals--human

beings--whose privacy rights are at issue.

¶131 It is on this basis that I would reach the "corporate privacy" issue and would, thus, arrive at essentially the same result as the majority. I concur.

/S/ JAMES C. NELSON

Justice W. William Leaphart concurs in the foregoing special concurrence.

/S/ W. WILLIAM LEAPHART